IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MARTHA M. HILL**, | : | Case No. 1:11-CV-1892 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | |
| Defendant. | : | |

The parties have consented to this case being transferred to the docket of the undersigned Magistrate Judge to conduct all proceedings and order the entry of final judgment.  Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act).  The parties have filed Briefs on the Merits (Docket Nos. 12 & 15).  For the reasons that follow, the Commissioner's decision is affirmed.

## I. PROCEDURAL BACKGROUND.

On August 22, 2008, Plaintiff applied for SSI and any federally administered State supplements under Title XVI of the Act, alleging that her disability began on February 11, 2007 (Docket No. 10, pp. 125-127 of 570).  The application was denied initially and upon reconsideration (Docket No. 10, pp.

63-65, 71-73 of 570).  On October 28, 2010, Administrative Law Judge (ALJ) J. Richard Staples

conducted a hearing and on December 16, 2010, he issued an unfavorable decision (Docket No. 10, pp.

15-24, 32 of 570).  On August 2, 2011, the Appeals Council denied Plaintiff's request for review,

rendering the ALJ's decision the final decision of the Commissioner (Docket No. 10, pp. 5-7 of 570).

Plaintiff filed a timely Complaint in this Court seeking judicial review (Docket No. 1).

## II. FACTUAL BACKGROUND.

At the hearing before ALJ Stables in Cleveland, Ohio, Plaintiff, represented by counsel, and

Gene Burkhammer, a Vocational Expert (VE), gave the following testimony.

**A.   PLAINTIFF.**

Plaintiff, a high school graduate, was 49 years of age.  Divorced, she resided alone.  Plaintiff

performed duties of a professional cleaner for sixteen hours weekly.  She earned $7.65 per hour.

Plaintiff's income from her work did not cover her expenses (Docket No. 10, pp. 38-39, 41 of 570).

Plaintiff's job performance was impacted by symptoms of dyspnea, fatigue, knee pain, podiatric

disease.  Plaintiff quit smoking two months preceding the hearing because her physician explained that

it interfered with her breathing.  Plaintiff had not used "street drugs," other illegal drugs or alcohol since

July 31, 2008.  She attended meetings to assist her in maintaining total sobriety.

Plaintiff described a painful right knee.  Her podiatric disease was severe, with symptoms worse

in the left foot than the right.  Occasionally, her feet were paralyzed.

Plaintiff had headaches precipitated by nervousness and emotional distress.  Generally, she

experienced headaches twice monthly.

The ALJ noted that Plaintiff used a cane to ambulate at the hearing.  Plaintiff explained that she

used the cane twice weekly depending on the severity of her right knee pain.  In fact, Plaintiff

considered the right knee pain her most severe impairment followed by the pain in her feet (Docket No. 10, pp. 40, 41, 42, 43, 48, 49 of 570).

Plaintiff was undergoing treatment for mental and emotional problems.  Symptoms of her disorder included avoidance of crowds and a mild impairment in her ability to remember and concentrate.  Plaintiff was prescribed Abilify®, a medication used generally in the treatment for depression and bipolar disorder, Paxil, a medication used generally to treat depression, anxiety and obsessive compulsive disorders and an unidentified sleep medication.  Plaintiff explained that she had no side effects from her medications (Docket No. 10, pp. 46, 47, 48 of 570; www.drugs.com).

With respect to functional limitations, Plaintiff suggested that she could not lift any more than ten pounds lest her arms "gave out" and her breathing difficulty was exacerbated (Docket No. 10, p. 45 of 570).  At work, Plaintiff alternated between sitting and standing (Docket No. 10, p. 51 of 570). Plaintiff did not drive; she never had a driver's license.  She prepared her meals and cleaned the dishes. She accompanied her friends to grocery shop.  Where she lived, no yard work was required (Docket No. 10, pp. 51-52 of 570).

Plaintiff attended all three of the Alcoholic's Anonymous meetings "most of the time"; she attended church practically every Sunday and she served the homeless on the first and third Saturday of the month (Docket No. 10, pp. 52 of 570).

B.    **THE VE.**

The ALJ asked that the VE assume an individual aged 49 years, with a high school education and no past relevant work and then assume the following:

1.    Exertional ability is light;
2.    Marked limitation on dealing with detail and with complex tasks;
3.    Moderate limitations on interacting with the public, co-workers and supervisors;
4.    Moderate limitation in adapting to stress and change;

3

5.       Avoid situations where the changes are fast-paced and frequent; and

6.       Embrace routine, fairly established repetitive-type routine.

(Docket No. 10, pp. 54-55, 56 of 570).

Using the Dictionary of Occupational Titles (DOT) as a guide, the VE opined that there was work that Plaintiff could perform.  The following table identifies that lists of jobs and their DOT description, the jobs' exertional level, the amount of training required to learn the job or specific vocational preparation (SVP) and numbers of jobs available locally, Statewide and nationally:

| Job | Exertional level | SVP | Number of Jobs Locally/State-wide/nationally |
|---|---|---|---|
| Housekeeping cleaner | Light work - Requires the ability to stand up to six hours in an eight-hour work day, lift up to 10 pounds frequently and up to 20 pounds occasionally. | 2--Requires anything beyond a short demonstration up to and including one month | 2,000, 20,000/500,000 |
| Fast food worker | Light work | 2--Requires anything beyond a short demonstration up to and including one month | 10,000/80,000/2,000,000 |
| Mail clerk | Light work | 2--Requires anything beyond a short demonstration up to and including one month | 800/6,000/160,000 |

(Docket No. 10, p. 56 of 570).

If the ability to interact with others and adapt to workplace demands and stresses were marked, these jobs would be excluded from the jobs that the hypothetical plaintiff could perform.  If an additional restriction were added–the person would need to have the ability to alternately sit and stand as needed to relieve pain–the jobs performed at the light level of exertion would be eliminated. However, the hypothetical person would have the ability to do sedentary jobs (Docket No. 10, pp. 56, 57 of 570).

4

### III.  MEDICAL EVIDENCE.

Medical evidence is the cornerstone for the determination of disability under Title XVI.  Each person who files a disability claim is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment.  20 C. F. R. § 416.912(c) (Thomson Reuters 2012).  The medical evidence generally comes from sources that have treated or evaluated the claimant for his or her impairment.  20 C. F. R. § 404.1512(b) (Thomson Reuters 2012).  What follows is a summary of the evaluations and treatments Plaintiff received categorized by source:

A.  **PHYSICAL IMPAIRMENTS, EVALUATIONS AND/OR TREATMENTS.**

1.  **DR. LAVINIA COZMIN, M. D**., AN INTERNIST.

On October 27, 2003, Dr. Cozmin referred Plaintiff,  her new patient,  for a mammogram and to a podiatrist for purposes of assessing bilateral breast tumors and post surgical dystrophic toes and postoperative scarring, respectively (Docket No. 10, p. 239 of 570).  It was confirmed on October 29, 2003, that Plaintiff's bilateral appearing cysts were benign.  The chemical tests administered on October 29, 2003, showed elevated levels of high-density lipoprotein (HDL) (Docket No. 10, pp. 249, 253 of 570; www.vitals.com/doctors/Dr_Lavinia_Cozmin.html).

A large rounded simple, cyst was identified deep to the right nipple in an ultrasound administered on November 6, 2003 (Docket No. 10, p. 247 of 570).  On November 17, 2003, a gynecological examination was performed (Docket No. 10, p. 238).  From a specimen collected from a left breast lump on November 20, 2003, some abnormality in the cells was detected (Docket No. 10, p. 243 of 570).

On March 9, 2004, efforts were made to resolve acute gastritis.  Samples of Prilosec were dispensed (Docket No. 10, p. 237).

On March 23, 2004, Plaintiff was treated for nasal congestion with a cough. Her heart and lungs were normal with no evidence of acute cardiopulmonary disease or pneumonia (Docket No. 10, p. 244 of 570).

On April 30, 2004, Plaintiff was diagnosed with acute exacerbation of chronic bronchitis attributed to smoking. Advair was prescribed for the bronchitis with counseling for smoking cessation (Docket No. 10, p. 236 of 570).

On May 19, 2004, Plaintiff's left X-ray mammogram showed no malignancy with benign appearing microcalcifications (Docket No. 10, p. 240 of 570).

### 2. DR. DANIEL C. DUFFY, DOCTOR OF PODIATRIC MEDICINE (DPM).

On February 24, 2004, Plaintiff presented with heavy hyperkeratosis on the plantar aspect of both feet with painful dubdermal callus and keratotic lesions. A treatment plan, including diagnostic tests and a prescription for orthotics were considered.

On April 7, 2004, Dr. Duffy noted that Plaintiff had a painful lesion on the bottoms of both the right and left foot and degenerative changes noted throughout the rest of the forefeet. Conservative care with removal of dead, damage and infected skin using a karalytic agent to help soften up the painful keratosis was employed first.

On April 29, 2004, Plaintiff was fitted for orthotics and underwent the medical removal of dead, damaged and infected tissue (Docket No. 10, p. 233 of 570; danielcduffydpm.com).

### 3. ST. VINCENT CHARITY HOSPITAL & HEALTH CENTER.

Beginning on August 29, 2008, Plaintiff presented with abdominal pain/flank pain/vomiting and diarrhea. She was diagnosed with a non-obstructive gas pattern and increased small bowel loops (Docket No. 10, pp. 425, 435-436 of 570).

On September 4, 2008, Plaintiff presented with pain in both feet.  Present was evidence of joint space narrowing and osteophytes.  There were degenerative changes and soft tissue swelling was detected in Plaintiff's foot (Docket No. 10, p. 317,424 of 570).

On September 20, 2008, the radiological examination of Plaintiff's chest showed no change in the COPD since October 20, 2000 (Docket No. 10, p. 423 of 570).

On September 26, 2008, Dr. Shane Manning, D.P.M., performed a surgery, fusing the first metaphalangeal joint, right, conducting osteotomy of proximal phalanx, right, arthrodesis of digits 2-4, right and arthroplasty of the fifth digit, right (Docket No. 10, pp. 312-315 of 510).

On September 27, 2008, Dr. Christina Wirtz, M. D., conducted a radiological review of the surgery and found that there were multiple fluoroscopic images showing placement of fixation pins across the distal first metatarsal and proximal phalanx of the right great toe (Docket No. 10, p. 418 of 570).

On October 13, 2008, Plaintiff underwent an ophthalmology examination.  She was diagnosed with a compound myopic stigmatism (Docket No. 10, pp. 420-430 of 570).

On October 14, 2008, Dr. Robert Porter, M. D., performed an X-ray of the right foot, after which he described post surgical changes to the proximal phalanges of the second, third and fourth toes, the osteotomy site of the mid shaft of the proximal phalanx of the big toe and the first metatarsal phalangeal joint (Docket No. 10, p. 416 of 570).

On November 15, 2008, Dr. Wirtz noted extensive post-surgical change with metallic hardware, the presence of osteopenia, a condition where bone mineral density is lower than normal, especially distally, and there was soft tissue swelling (Docket No. 10, p. 411 of 570; www.osteopenia.com).

On November 31, 2008, Plaintiff's foot was X-rayed.  The hardware from previous surgery was

in place.  Pain medication was prescribed (Docket No. 10, pp. 409 of 570).

On December 18, 2008, Plaintiff complained of pain; she underwent another foot X-ray.  There was a defect in the proximal phalanx of the great toe with a screw traversing the lucency (Docket No. 10, pp. 410, 412 of 570).

On February 12, 2009, Dr. Ronald Cohen, M. D., noted that there were post-surgical changes of the second through the fifth digits, including osteopenia and mild soft tissue swelling.  Plaintiff had pain upon palpation (Docket No. 10, p. 413 of 570).

On June 17, 2009, Dr. Shane Manning, M. D., conducted follow-up care for continued pain.  Dr. Manning noted, emphatically, that Plaintiff had apparently been non-compliant with the course of treatment (Docket No. 10, p. 479 of 570).

On June 19, 2009, Dr. Dawn E. Donich, M. D., conducted a review of the post-surgical changes.  Plaintiff's pain was not attributed to acute bony abnormality or osteomyelitis.  The hardware was stationed at the first metatarsophalangeal joint, any of the spheroid joints between the heads of the metatarsal bones and the bases of the proximal phalanges of the toes (Docket No. 10, p. 491 of 570; www.medical-dictionary.thefreedictionary.com).

On July 24, 2009, the radiological study of Plaintiff's knee showed normal osseous structures of the knee (Docket No. 10, p. 489 of 570).

On July 30, 2009, there was an indication of pain although the plate and screw in the great toe were unchanged in morphology (Docket No. 10, p. 488 of 570).  On the following day, Plaintiff presented for surgical correction of the exostosis on the plantar aspect of the right third metatarsal.  Dr. Manning excised some new bone that was on the surface of bone in the right third metatarsal (Docket No. 10, pp. 484-487 of 570).

On August 5, 2009, there was no evidence of deep vein thrombosis and Plaintiff osseous structures in her knee were normal (Docket No. 10, pp. 482, 483 of 570).

On August 6, 2009, Dr. Amanda "Maszaros," conducted the follow up care.  Plaintiff's progress was considered "excellent" and a new dressing was applied.  Pain medication was dispensed (Docket No. 10, p. 477of 570).

On August 13, 2009, Dr. Cohen removed a lesion on the right foot.  Medication was prescribed for pain (Docket No. 10, p. 476 of 570).

On September 29, 2009, Plaintiff was prescribed a pain reliever to treat back pain (Docket No. 10, pp. 472-474 of 570).

On October 1, 2009, Plaintiff underwent continued foot care.  Dr. Wissam E. Khoury performed a nail debridement of all ten toes (Docket No. 10, p. 470 of 570).

On November 6, 2009, the results from the diagnostic mammogram showed no sign of mass or asymmetric density.  However, there was a recommendation for spot compression images (Docket No. 10, pp. 480, 481 of 570).

On December 17, 2009, Plaintiff underwent continued foot care.  Dr. Khoury noted that Plaintiff was not wearing her shoe inserts.  The new lesions were debrided (Docket No. 10, p. 469 of 570).

On December 22, 2009, Plaintiff presented and was treated for pain in her left arm and knee pain(Docket No. 10, pp. 469-469 of 570).

On June 17, 2010, Plaintiff complained of bilateral foot pain.  Three radiological views of Plaintiff's feet were taken.  In the left foot, there was deformity of the left metatarsal distally with degenerative changes in the first metatarsophalangeal joint, no acute fracture or dislocation and ossification lateral to the cuboid bone.  In the right foot, there was a plate and screw fixation of the first

metatarsophalangeal joint, no acute fracture or dislocation and bone fusion at the proximal interphalangeal joints of the second, third and fourth toes with post-surgical changes at the fifth toe (Docket No. 10, pp. 519, 527-529 of 570).

On June 22, 2010, the attending physician addressed issues of high cholesterol (Docket No. 10, p. 525 of 570).

On June 23, 2010, Dr. Jeffrey A. Stanley, D. O., performed a "waveform" analysis. The results from the study were not consistent with any major arterial insufficiency to either lower extremity (Docket No. 10, p. 520 of 570). Notably, Plaintiff's "bad cholesterol" levels (low-density lipoprotein) were elevated (Docket No. 10, p. 521 of 570).

A follow up consultation was held on August 5, 2010, to determine if Plaintiff needed orthotics (Docket No. 10, p. 523 of 570).

4.    **HURON HOSPITAL**.

On September 28, 2008, Plaintiff was vomiting blood and experiencing nausea. She was ultimately treated for gastritis (Docket No. 10, pp. 322-326 of 570).

On March 25, 2010, Plaintiff presented with complaints of chest pain. Her sinus rhythm was normal. Plaintiff refused further observation (Docket No. 10, pp. 507-518 of 570).

On April 23, 2010, Plaintiff presented with stomach pain. She was diagnosed with and treated for gastritis. The abdominal pain was resolved. In addition, Plaintiff's potassium level was low and she received replacement therapy (Docket No. 10, pp. 494-501, 503-504 of 570).

On June 8, 2010, Plaintiff presented with complaints of chest pain. There was no acute chest pathology. There was, however, an upper respiratory infection (Docket No. 10, pp. 548-557 of 570).

On August 18, 2010, Plaintiff presented with dyspnea and a cough. She was diagnosed with and

10

treated for acute bronchitis (Docket No. 10, pp. 540-547 of 570).

5.      FRANKLIN D. KRAUSE, M. D., A PULMONOLOGIST AND INTERNAL MEDICINE
        SPECIALIST.

On October 28, 2008, Dr. Krause reviewed Plaintiff's medical history and laboratory data and
conducted a physical examination.  Plaintiff reported that she lived in a treatment center with two
roommates.  Dr. Kraus' final diagnoses were: "1) S/P recent surgery -  toes of the right foot as described
with indwelling pins and significant pain, with previous surgery left foot with pain, hammertoes.  2)
History of substance abuse and depression, to be evaluated elsewhere.  3) History of low back pain, with
full range of motion, without radiculopathy. "  It was his opinion that Plaintiff had issues with depression
and substance abuse but her major problems appeared to be her right foot as just about one month after
surgery with indwelling hardware in her toes (Docket No. 10, pp. 369-370 of 570;
www.healthgrades.com/physician/dr-franklin-krause-whgmk).

6.      UNIVERSITY HOSPITALS CASE MEDICAL CENTER.

On June 29, 2009, Plaintiff was treated for abdominal pain that had persisted for two to six days
(Docket No. 10, pp. 460-466 of 570).

7.      DR. KEYVAN RAVAKHAH, M. D., AN INTERNIST.

On May 4, 2010, Plaintiff was prescribed an aerosol inhaler to treat chronic bronchitis (Docket
No. 10, p. 569 of 570; www.vitals.com/doctors/Dr_Keyvan_Ravakhah.html).

On July 13, 2010, August 31, 2010 and September 1, 2010, Plaintiff's knee was aspirated and
injected with an anti-inflammatory drug for purposes of managing her pain (Docket No. 10, p. 558-566
of 570).

B.      MENTAL IMPAIRMENTS, EVALUATIONS AND TREATMENT.
        1.      THE NORD CENTER, A COMMUNITY MENTAL HEALTH SERVICE PROVIDER.

11

With the assistance of a licensed social worker, Plaintiff identified her problems, goals and prospective treatment options on October 27, 2001 (Docket No. 10, pp. 291-292 of 570; www.nordcenter.org).

Later, Plaintiff underwent a diagnostic assessment on June 1, 2004. She was diagnosed with an anxiety disorder, not otherwise specified (Docket No. 10, pp. 259, 288 of 570). Plaintiff made contact on June 15, 2004 and her case was closed on August 16, 2004. She was discharged for noncompliance (Docket No. 10, pp. 271-277 of 570).

### 2. DR. MITCHELL WAX, PH.D., PSYCHOLOGIST.

On August 14, 2002, a clinical evaluation was completed during which the Wechsler Adult Intelligence examination (WAIS-3), the Wechsler Memory Scale (WMS), the Wide Range Achievement Test (WRAT) and the Nelson Skills Reading Test (NSRT) were administered with the assistance of a psychological assistant Kim Pachis.

1. WAIS-III–although the test was valid, the evaluator noticed that Plaintiff was disinterested in testing, appearing annoyed and confused. The evaluator suspected that Plaintiff functioned at a much higher level than her test results indicated. Plaintiff appeared to function in the borderline range and her estimated intelligence quotient was within the borderline range, too.
2. WMS–there was a serious problem with memory–immediate recall of verbally presented short paragraphs was not within normal limits, her memory for digits was very poor and her ability to remember paired words was significantly poor.
3. NSRT--Plaintiff could not read the sample paragraph. The evaluator suspected that Plaintiff had a higher reading score than the test results indicated.
3. WRAT-3--Plaintiff's combined grade equivalent word recognition score was 3.7. This means that she had a third grade reading comprehension ability

Under the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS which categorized psychiatric diagnoses, causes and prognoses, Dr. Wax opined that there was the presence of major depression with severe psychotic features, obsessive/compulsive disorder with poor insight, and

moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers) (Docket No. 10, pp. 304-306 of 570; www.healthgrades.com/provider/mitchell-wax-ymdmk).

3.    **DR. MICHAEL B. LEACH, PH. D., A PSYCHOLOGIST.**

On June 18, 2004 and October 22, 2008, "adult clinical interviews" were conducted.  Initially, Dr. Leach concluded that Plaintiff had a major depression, single episode, severe, the stressors of poverty, health, fatigue and a global assessment of functioning, or some serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  With respect to the four work-related mental abilities, it was Dr. Leach's opinion that:

1.    Plaintiff's mental ability to relate to others was markedly impaired.
2.    Plaintiff's mental ability to understand, remember and follow instructions was moderately impaired.
3.    Plaintiff's mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was moderately impaired.
4.    Plaintiff's mental ability to withstand the stress and pressures associated with day-to-day work activity was markedly impaired due to her major depression, severe.

(Docket No. 10, pp. 298, 299 of 570; www.healthgrades.com/provider/michael-leach-38t93).

In the second evaluation, Dr. Leach diagnosed Plaintiff with an adjustment disorder, cocaine dependence and moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers).  Dr. Leach opined that Plaintiff was functioning at an average range of intelligence based on educational and work history (Docket No. 10, pp. 380-384 of 570).

4.    **THE NORTHWESTERN RECOVERY ASSOCIATION**.

Plaintiff became a resident in the housing support program on July 31, 2008.  Treatment included

13

a mandatory 12-step meeting attendance, fellowship and discussion group therapy (Docket Nol 10, p. 234 of 570).

     **5**.    **DR. CATHERINE FLYNN, PSY.D.**

Then on November 16, 2008, Dr. Flynn conducted a review and completed the PSYCHIATRIC REVIEW TECHNIQUE form.  She opined that Plaintiff had several medically determinable impairments, namely, an adjustment disorder with anxiety and depression and cocaine dependence.  The degrees of functional limitations that existed as a result of Plaintiff's mental disorders were:

| | | |
|---|---|---|
| 1. | Restriction of activities of daily living | Mild |
| 2. | Difficulties in maintaining social functioning | Moderate |
| 3. | Difficulties in maintaining concentration, persistence or pace | Moderate |
| 4. | Episodes of decompensation, each of extended length. | None. |

The MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT also completed on November 16, 2008, showed:

1.    Moderate limitations in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and

2.    Moderate limitations in her ability to interact appropriately with the general public.

(Docket No. 10, pp. 385-396 of 510).

     **6**.    **JOE GREGOR, A COMMUNITY PSYCHIATRIC SUPPORTIVE TREATMENT SPECIALIST**.

After Plaintiff completed a DAILY ACTIVITIES QUESTIONNAIRE on April 9, 2009, Mr. Gregor completed an observational statement in which he noted that Plaintiff had difficulty with:

1.    Concentration
2.    Persistence
3.    Cooperation
4.    Judgment
5.    Reliability
6.    Social interaction

7.      Interaction with authority
8.      Following simple instructions
9.      Following program rules.

(Docket No. 10, p. 448 of 570).

**7.      DR. LIBBIE STOUNSIFER, M. D., A PSYCHIATRY RESIDENT.**

After conducting a clinical interview, Dr. Stounsifer determined on February 26, 2009, that:

1.      Plaintiff had no impairment in her mental ability to understand and follow instructions.
2.      Plaintiff had no impairment in her mental ability to maintain attention to perform simple, repetitive tasks.
3.      Plaintiff was markedly impaired in her mental ability to relate to others, including fellow workers and supervisors due to chronic irritability.
4.      Plaintiff was markedly impaired in her ability to withstand the stress and pressures with day-to-day work activity due to poor coping/frustration tolerance.
5.      Plaintiff was a paranoid schizophrenic with cocaine dependence.
6.      Plaintiff had gastroesophageal reflux disease.
7.      Plaintiff had serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).

(Docket No. 10, pp. 456 of 570).

**8.      DR. JAMES T. BUKUTS, A PSYCHIATRIST.**

On March 16, 2010, Dr. Bukuts completed the MEDICAL SOURCE STATEMENT form, finding that

Plaintiff had a chronic disabling illness with which she struggled and significant limitations in her ability

to:

1.      Maintain attention and concentration for extended periods of two-hour segments.
2.      Deal with the public.
3.      Deal with work stresses.
4.      Understand, remember and carry out detailed but not complex job instructions.
5.      Understand, remember and carry out complex job instructions.

(Docket No. 10, pp. 492-493 of 570; www.vitals.com/doctors/Dr_James_Bukuts.html).

**IV.  STEPS TO SHOWING ENTITLEMENT TO SSI.**

SSI is available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730

15

(6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See* also 20 C.F.R. § 416.920)).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.

To determine disability under Sections 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities.  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir.

16

2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id*. (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ found that through the date last insured:

1.   Plaintiff had not engaged in substantial gainful employment since August 22, 2008, the application date.

2.

3.   Plaintiff had the following severe impairments:  status post right foot surgery with degenerative joint disease of the first metaphalangeal joint fusion; hallex interphalangeus of the first digit, and digital contractures of the second and fifth toes; post-surgical changes involving the toes on the left foot; bilateral degenerative joint disease of both knees, adjustment disorder with mixed anxiety and depression and history of cocaine dependence.

4.   Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

5.   Plaintiff had the residual functional capacity to perform light work as defined in 20 C. F. R. § 416.967(b), except that her ability to adapt to stress and change and interact appropriately with the public, supervisors, and co-workers was moderately limited and her ability to understand, remember, and execute complex or detailed instructions was markedly limited.

6.   Plaintiff was a younger individual who was 49 years of age on the date the application was filed.  During the pendency of this case, Plaintiff changed age categories to closely approaching advanced age.  Plaintiff had at least a high school education and was able to communicate in English.  Plaintiff had no past relevant work so transferability of job skills was not an issue.

7.   Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

8.   Plaintiff was not under a disability as defined in the Act since August 22, 2008, the date the application was filed.

(Docket No. 10, pp. 15-24 of 570).

## VI.  STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)).  The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)).  If substantial evidence supports the Commissioner's decision,

18

this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

**VII. DISCUSSION**.

Plaintiff argues that her case should be reversed and remanded for the reasons that:

1.    The ALJ's assessment of pain as disabling impairment and the corresponding credibility analysis of Plaintiff are not supported by substantial evidence.
2.    The ALJ erred in failing to give appropriate weight to the opinions of Drs. Stounsifer, Bukuts and Leach

Defendant responds:

1.    The ALJ followed the appropriate rules for analyzing Plaintiff's foot pain and limitations.
2.    Substantial evidence supports the weight given to the medical source opinions.

A.    ASSESSMENT OF PAIN AND CREDIBILITY.

Plaintiff takes issue with the ALJ's pain analysis and his finding that the severity of Plaintiff's symptoms was not credible.  Plaintiff argues that her pain alone, the result of a medical impairment, is severe enough to constitute disability.

As the Sixth Circuit has long recognized, "pain alone," if caused by a medical impairment, may be severe enough to constitute a disability.  *Dozier v. Astrue,* 2012 WL 2344163, *5 (N.D.Ohio,2012) (*citing Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 538 (6th Cir.1981), *cert. denied*, 103 S.Ct. 2428 (1983)).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step analysis.  *Id.*  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  *Id.*  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms."  *Id.* (*citing* TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS, SSR 96-7p (July 2, 1996)).  Essentially, the same test applies where the alleged

19

symptom is pain, as the Commissioner must (1) examine whether there is objective medical evidence of an underlying medical condition. *Id.* If there is, then the Commissioner must examine whether (2)(a) the objective medical evidence confirms the alleged severity of pain, or (2)(b) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* (*see Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir.1986)).

Credibility determinations regarding a claimant's subjective complaints (of pain) rest with the ALJ. *Dozier v. Astrue*, 2012 WL 2344163, *5 (N.D.Ohio,2012) *adopted by* 2012 WL 2343907 (N.D.Ohio 2012) (*see Siterlet v. Secretary of Health & Human Services*, 823 F.2d 918, 920 (6th Cir.1987)). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *Id.* (*see Villareal v. Secretary of Health & Human Services*, 818 F.2d 461, 463 (6th Cir.1987).

The credibility determination or decision must contain specific reasons for the finding, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight. *Id.* (*citing* SSR 96-7p, *supra*; *see also Felisky*, 35 F.2d at 1036) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross v. Commissioner of Social Security*, 373 F.Supp.2d 724, 733 (N.D.Ohio,2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")) To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence in the record. *Id.* (*see* SSR 96-7p, *supra*). Beyond medical evidence,

20

there are seven factors that the ALJ should consider.

> The seven factors are:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at fn. 2 (*citing* SSR 96–7p, *supra*, INTRODUCTION; *see also Cross, supra*, 375 F.Supp.2d at 732).

In the instant case, the ALJ determined that Plaintiff's foot problems could reasonably be expected to cause the alleged symptoms (Docket No. 10, p. 20 of 570).  However, the overwhelming medical evidence shows a longitudinal history from which the ALJ could find that the objectively established medical condition or the pain that resulted therefrom was not of the severity, intensity or limiting effect that was expected to last 12 months.  Noting the botched surgeries performed on Plaintiff's feet in the 1980s, the ALJ articulated that the evidence did not show a long or continuous history of medical treatment for pain.  The evidence showed flare-ups of pain in an unpredictable manner.  Plaintiff was treated in 2004 for a short period of time.  It appears that Plaintiff's symptoms were ameliorated shortly after surgery.  Then the symptoms erupted in 2008 as there is no medical evidence of treatment between 2004 and 2008.  In fact, Plaintiff was able to walk and put her full weight on the foot without pain in November 2008.  There were long periods of time for which narcotic pain medications were not prescribed.  Plaintiff failed to follow the advice of her treating physician who seemed to think that continued smoking and failure to elevate her feet affected her prognosis.  Then in 2009, Plaintiff sought treatment for calluses and pain emanating from the 2008 foot surgery.  In 2010, Plaintiff had her calluses and toenails debrided.  There was no objective medical evidence of reduced motion or motor disruption

21

because of the pain.  Neither is there information that Plaintiff could not ambulate without the prescribed orthotic devices.  The severity of these limitations could be confirmed by diagnostic testing.  The available objective evidence does not substantiate Plaintiff's statements of severity.  The ALJ properly articulated his reasons, based on substantial evidence for his conclusion that Plaintiff's severe impairments did not produce disabling pain.

Because the objective medical evidence did not substantiate Plaintiff's subjective complaints, the ALJ was required to consider Plaintiff's statements about symptoms with the rest of the relevant evidence in the case record and reach a conclusion about Plaintiff's credibility in making those statements.  Thus, the ALJ engaged in a discussion of the seven factors delineated in 20 C. F. R. § 416.929.  First, the ALJ considered that Plaintiff was still employed for sixteen hours weekly, she attended AA meetings, participated in church functions regularly, shopped for groceries and walked one-half of a mile with breaks.  Second, the ALJ considered the location, duration, frequency, and intensity of Plaintiff's pain, specifically, between February 2004 and August 2010, there were only three occasions when Plaintiff complained of or sought treatment for severe foot pain (Docket No. 10, pp. 19-20 of 570).  In September 2008, Plaintiff presented to the hospital with bilateral foot pain.  By November 2008, she had undergone surgery and was able to walk and place weight on the foot.  Her foot was doing well in October 2009 and at the time of hearing, Plaintiff was awaiting further surgery to correct painful calluses and toenails (Docket No. 10, p. 20 of 570).  Third, there was no evidence of factors that precipitated and aggravated the symptoms.  Fourth, Plaintiff was prescribed pain medication episodically to alleviate pain or symptoms.  There is no documented evidence of the medications' ineffectiveness.  Plaintiff testified that the medication used to treat depression had no effects.  Fifth, Plaintiff was advised to quit smoking and elevate her feet to alleviate the symptoms of pain.  Both recommendations were considered helpful to

22

alleviating pain and other symptoms and improving her prognosis.  Plaintiff claimed that she quit smoking several months prior to the hearing; otherwise, there is no evidence that she complied with the treatment advice of her physician.  Sixth, Plaintiff did not identify other measures that she used to relieve pain or other symptoms.  Seventh, none of her treating physicians identified any factors concerning Plaintiff's functional limitations and restrictions due to pain.

The Magistrate finds that it is sufficiently clear the weight the ALJ gave to Plaintiff's statements and the reason for the weight.  The ALJ properly weighed the medical evidence, statements by Plaintiff and other information provided by the medical sources to determine if Plaintiff was credible with respect to the severity of her symptoms.  The Magistrate is persuaded that the ALJ's credibility decision should not be disturbed.

**B.**    **WEIGHT GIVEN TO THE TREATING AND CONSULTATIVE SOURCES.**

In her second claim, Plaintiff suggests that the ALJ failed to appropriately consider the opinions of treating psychiatrists, Drs. Stounsifer and Bukuts, whose opinions were consistent with those of her case manager, Joe Gregor.  The ALJ attributed too much weight to Dr. Leach, a State agency consultant.

The Commissioner has elected to impose certain standards on the treatment of medical source evidence.  *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502)).  Under one such standard, commonly called the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it:  "the length of the treatment relationship and the frequency of examination, the nature and

23

extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir.2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).

Importantly, the Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* (*citing* TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE, SSR 96-2P, *12 (July 02, 1996)). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not." *Id.* at 937-938 (*citing Wilson*, *supra*, 378 F.3d at 544).  Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule."  *Id*. at 938 (*citing Wilson*, 378 F. 3d at 544–45).

Dr. Stounsifer was not considered a treating source.  Under the rules, the ALJ was not required to give good reasons for discounting the opinions of a non-treating source.  The medical records show that Dr. Stounsifer was a psychiatry resident who conducted an evaluation on February 26, 2009 based on one meeting and undoubtedly, her observations of Plaintiff's reactions to certain stimuli.  Dr. Stounsifer did not conduct any diagnostic tests.  Even if her opinions are consistent with those of Joe Gregor, Plaintiff's social worker, the ALJ was not required to give them controlling weight because at

24

the very least, they were not well-supported by medically acceptable clinical and laboratory diagnostic techniques (Docket No. 10, pp. 450-456 of 570).  The ALJ did all that the rules require:  he considered the evidence and then explained to subsequent reviewers the weight given to Dr. Stounsifer's opinions (Docket No. 10, p. 22 of 570).

The ALJ acknowledged that Dr. Bukuts was a treating psychiatrist.  In arriving at this conclusion, the ALJ considered that Dr. Bukuts treated Plaintiff in 2008 and 2009, that the nature of the relationship was the impact of her mental impairment on her ability to withstand the stress and pressures of day-to-day work activities and that Dr. Bukuts' opinions were consistent with Joe Gregor's opinions (Docket No. 10, p. 22 of 570).  Despite the presumptive weight given to Dr. Bukuts' opinions, the ALJ correctly found that Dr. Bukuts' opinions were not well supported by treatment notes, diagnostic tests, clinical interviews or a detailed, longitudinal picture of Plaintiff's medical impairments.  In fact, Dr. Bukuts was unable to provide that unique perspective of Plaintiff's mental impairments that can only be obtained from objective medical findings or from reports of individual examinations.  In the absence of objective medical evidence, the ALJ was not persuaded that Dr. Bukuts' opinions were entitled to controlling weight.

Plaintiff claims that the ALJ erred in giving considerable weight to the opinions of Dr. Leach, a state agency physician, who assessed Plaintiff's mental impairments and their effect on her functional limitations.

It is well established that opinions from agency medical sources are considered opinion evidence. *Caillet v. Astrue,* 2012 WL 4120383, *8 (N.D.Ohio,2012) (*citing* 20 C.F.R. §§ 404.1527(f), 416.927(f)). The regulations mandate that unless the treating physician's opinion is given controlling weight, the ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological

25

consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, non-treating sources, and other nonexamining sources who do work for us. *Id.* (*citing* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii)).  More weight is generally placed on the opinions of examining medical sources than on those of non-examining medical sources. *Id.* (*See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)).  However, the opinions of non-examining state agency medical consultants can, under some circumstances, be given significant weight. *Id.* (*citing Hart v. Astrue*, 2009 WL 2485968, at *8 (S.D.Ohio, 2009) (unreported)).  This occurs because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  *Id.* (*citing* TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p, 1996 WL 374180 (July 2, 1996)).  Thus, the ALJ weighs the opinions of agency examining physicians and agency reviewing physicians under the same factors as treating physicians including weighing the supportability and consistency of the opinions, as well as the specialization of the physician. *Id.* (*See* 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f)).

Here, the ALJ found that the opinions of a non-treating consultative psychiatrist constituted substantial evidence because the form completed by Dr. Bukut did not show that he had treated Plaintiff over a period of time.  As previously discussed herein, Dr. Bukut's opinions are not entitled to deference because they were not properly supported by evidence in the record.  Having failed to attribute controlling weight to the opinions of Dr. Bukut, the ALJ was obligated to explain in the decision the weight given to the opinions of a State agency psychological consultant as he would for any opinion of

26

Dr. Bukut.  He met the burden of establishing that Dr. Leach was a clinical psychologist and that his opinions were supported by clinical findings and a clear rationale.  Dr. Leach's observations were given greater weight than the opinion of the treating source because they were accompanied by detailed explanations, after a full review of the medical record evidence.  As a medical consultant, Dr. Leach is well versed in the functionality as it pertains to Plaintiff's disability.

Since the Commissioner has applied the correct legal standards and made findings of fact supported by substantial evidence in the record, the Magistrate will not disturb his decision.

### VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**


/s/ Vernelis K. Armstrong
United States Magistrate Judge


Date:   November 19, 2012

27